Clark v. Burnette, 2021 NCBC 29.

STATE OF NORTH CAROLINA

WAKE COUNTY

ANDREW CLARK,

Plaintiff,

v.

JARED BURNETTE and JBAC
PROPERTIES, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 8565

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE**

THIS MATTER comes before the Court on Plaintiff Andrew Clark's ("Clark" or "Plaintiff") Motion for Summary Judgment ("Clark's Motion for Summary Judgment," ECF No. 56), Defendants Jared Burnette ("Burnette") and JBAC Properties, LLC's ("JBAC") (collectively, Burnette and JBAC are "Defendants") Motion For Summary Judgment ("Defendants' Motion for Summary Judgment," ECF No. 59), and Defendants' Motion to Strike Affidavit of Carrole Mulkey Dayton, ("Motion to Strike," ECF No. 67) (collectively, Clark's Motion for Summary Judgment, Defendants' Motion for Summary Judgment and the Motion to Strike are the "Motions"). The parties filed evidentiary materials and briefs in support of and in opposition to the Motions.

THE COURT, after considering the Motions, the briefs in support of and in opposition to the Motions, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES that Clark's Motion for Summary Judgment should be DENIED, in part, and GRANTED, in part; that Defendants'

Motion for Summary Judgment should be GRANTED, in part, and DENIED, in part; and Defendants' Motion to Strike should be DENIED, for the reasons set forth below.

*Barker Richardson, PLLC, by Ian Richardson, Esq. and Daniel T. Barker, Esq. for Plaintiff Andrew Clark.*

*Williams Mullen, by Camden R. Webb, Esq., John W. Holten, Esq., Caitlin M. Poe, Esq. for Defendants Jared Burnette and JBAC Properties, LLC.*

McGuire, Judge.

I.      FACTS AND PROCEDURAL BACKGROUND

1.      On December 8, 2011, Clark and Burnette formed JBAC, a North Carolina limited liability company. (Deposition of Andrew Clark, ECF No. 60.1, at p. 23.)  Clark and Burnette each own a 50% membership interest in JBAC and are JBAC's managers.  (ECF No. 60.1, at p. 25.)  JBAC owns and operates rooming houses and other rental properties in Raleigh, North Carolina.  (Complaint, ECF No. 3, ¶ 21.)

2.      On November 16, 2012, Clark and Burnette executed the Operating Agreement of JBAC Properties, LLC.  ("Operating Agreement," ECF No. 40.2, at cover page and p. 1; ECF No. 60.1, at p. 26; Deposition of Jared Burnette, ECF No. 57.1, at p. 70.)  Attorney Lance R. Fife ("Fife") prepared the Operating Agreement. (Affidavit of Lance Fife, ECF No. 60.2, at ¶¶ 23.)  It is undisputed that at the time the parties executed the Operating Agreement, JBAC owned properties on which it operated rooming houses and rental properties.  The Operating Agreement contains, *inter alia*, the following terms relevant to determination of the Motions:

## ARTICLE 4
## MEMBERS AND UNITS

4.01 <u>Members</u> The names, addresses and Ownership Units of the Members are as set forth on Exhibit A hereto as amended from time to time. The Manager shall be required to update Schedule A from time to time as necessary to accurately reflect the information therein. Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

(ECF No. 40.2, at p. 4.)

## ARTICLE 5
## RIGHTS AND DUTIES OF MANAGERS

5.02 <u>Managers</u>

(a) The Company shall have two (2) Managers, who shall be Jared Burnette and Andrew Clark, and shall remain a [*sic*] Managers of the Company until their death, incapacity or resignation. In the event of death, incapacity or resignation of the Managers, then the surviving Manager shall be the Successor Manager.

(b) The Managers shall have the responsibility for the day to day operation and management of the Company, and they shall have the authority to sign any legal documents for the Company. Both mangers [*sic*] shall be required to sign and [*sic*] Deeds transferring real property from the name of the company. Either manager (and only one (1) manager) is required to sign any HUD settlement statements when the company purchases real property but written consent by the other manager is required prior to signing the HUD statement.

(c) Any purchase or expense that exceeds $5,000.00 requires written consent form [*sic*] both managers.

(*Id.* at pp. 4–5.)

5.03 <u>Certain Powers of Managers</u>. Without limiting the generality of Section 5.01, and subject to the restrictions under Section 5.04, the Managers shall have power and authority, on behalf of the Company:

. . .

(h) The managers agree that each manager has the following duties:

**Andrew Clark:** Primarily responsible for Collections, Property Maintenance and day to day operations.

**Jared Burnette:** Primarily responsible for Acquiring, Financing, and Strategic Direction of Investments.

(*Id.* at pp. 5–6, emphasis in original.) The evidence shows that the management duties assigned to Clark and Burnette reflected their different anticipated contributions to JBAC. Burnette had more experience in residential real estate and Clark thought he could learn from working with him. (ECF No. 60.1, at p. 22.) Burnette also made a more substantial upfront investment in the company: Burnette contributed about $300,000 while Clark and his wife have contributed a total of $70,000 over the years. (*Id.* at p. 28.)

3. The Operating Agreement further provided as follows:

**ARTICLE 16**
**DISSOLUTION AND TERMINATION**

16.03 <u>Winding Up, Liquidation and Distribution of Assets</u>

. . .

(b)(3) In the event Clark elects to dissolve the Company: Burnette shall have at his sole election the rights to keep all existing real estate. In determining the amount to be allocated to Clark, the Members agree that Clark shall

receive one-half (1/2) of the value of the properties listed on Exhibit "A" at the acquisition price (initial value) shown on Exhibit "A" ( after deducting any and all liens or mortgage or Deeds of Trust that encumber the properties or any other debts of the Company) and NOT of [*sic*] the current fair market value "FMV" of the properties at the time of the Withdrawel [*sic*] or Dissolution as described in this Operating Agreement.

(b)(4) In the event Burnette elects to dissolve the Company: In determining the amount to be allocated to Clark, the Members agree that Clark and Burnette shall split any equity in the company equally.

(ECF No. 40.2, at p. 15.)

4. Despite the reference in article 16.03(b)(3) indicating that "Exhibit A" is a list of properties owned by JBAC with their "acquisition price (initial value)," the Exhibit A attached to the Operating Agreement at the time the parties executed it is a schedule purporting to contain the members' initial contributions and ownership units. (ECF No. 40.2 at p. 18.)[1] It is undisputed that, at the time Clark and Burnette executed the Operating Agreement, a list of JBAC properties and the acquisition prices or values of the properties ("JBAC Properties List") was not attached to the Operating Agreement. Burnette testified: "I do not recall exactly when we signed the [Operating Agreement] but I do believe that we signed [the Operating Agreement] and then we sent the acquisition costs." (ECF No. 57.1, at p. 77.) However, later the same day, at 4:39 p.m. on November 16, 2012, Burnette sent an email to Fife, copying

---

[1] The Exhibit A attached to the Operating Agreement is referenced in Article 4.01, which states, "[t]he names, addresses and Ownership Units of the members are set forth on Exhibit A hereto as amended from time to time";  and in Article 9.01, which states,"[t]he amounts, description, value of any non-cash contributions and payment terms of the Capital Contributions of each Member are set forth on Exhibit 'A' hereto as amended from time to time." (*Id.* at pp. 4, 9.)

Clark, stating, "[h]ere is the link to 'JBAC Properties Acquisition Cost.xls' in my Dropbox." (ECF No. 57.1, at p. 71–72; November 16, 2012 Email, ECF No. 60.4, at p. 2.)

5.    On November 17, 2012, Fife emailed the Operating Agreement to Burnette and Clark.   Fife's November 17, 2012 email states, "[a]ttached is the Operating Agreement for JBAC Properties."   (Nov. 17, 2012 Email, ECF No. 57.3.) The last page of the Operating Agreement attached to Fife's email (p. 18) is the schedule containing the members' initial contributions and ownership units.  (*Id*.) The Operating Agreement attached to the November 17, 2012 Email does not have the JBAC Properties List attached.  (*Id*.)

6.    On November 20, 2012, Burnette sent an email to Fife, copying Clark, stating: "Lance.  No hurry on this but wanted to make sure you had the acquisition costs to attach to the JBAC Properties LLC operating agreement.  There is a link in the e-mail chain and I pasted it below as well."  (Nov. 20, 2012 Email, ECF No. 60.4, at p.1; ECF No. 57.1, at p. 76.)  The list contained in the November 20, 2012 Email is titled "JBAC Properties" and lists the acquisition dates, addresses, and "acquisition cost" of twenty (20) properties.  (ECF No. 60.4.)  Clark admits that the November 20, 2012 Email was delivered to his email address.  (ECF 60.1, at p. 35.)  Nevertheless, Clark claims that the first time he remembers seeing the JBAC Properties List was after the lawsuit was filed.  (*Id*.)

7.    During  discovery,  Defendants  produced  a  copy  of  the  Operating Agreement with a copy of the JBAC Properties List paperclipped to the agreement

following page eighteen. (ECF No. 60.2, Ex. A at .pdf p. 22.) Fife states in his affidavit that the Operating Agreement attached to his affidavit, the last page of which includes the list of properties that Burnette sent Fife on November 20, 2012, is a "copy of the fully-executed copy of the Operating Agreement that I retained in my physical paper files." (ECF No. 60.2, at ¶ 6.) This JBAC Properties List attached to Fife's copy of the Operating Agreement was not produced to Clark until in or about August 2020. (ECF No. 60.1, at p. 36.)

8.      It is undisputed that the Operating Agreement placed on Burnette the responsibility "for Acquiring, Financing, and Strategic Direction of Investments, including the acquisition of additional properties for JBAC." (ECF No. 40.2, at p. 6; ECF 57.1, at p. 82.) Burnette acquired twenty (20) properties for JBAC before the execution of the Operating Agreement in November 2012. However, Clark contends, and Burnette does not dispute, that Burnette's last acquisition of property for JBAC following execution of the Operating Agreement occurred on October 3, 2013. (Clark's Third Supplemental Response to Interrogatory, ECF No. 57.7, at .pdf p. 7.) Nevertheless, Clark claims that he did not become "aware that [Burnette] had no further intention of acquiring property for JBAC [until] on or about September 26, 2018, during a meeting at Morgan Street Food Hall." (ECF No. 60.1, at p. 62.)

9.      Clark also contends that Burnette failed to adequately participate in the day-to-day management of JBAC. (Clark's Br. in Supp. of Mot. SJ, ECF No. 58, at pp. 4–6.) Burnette testified: "[i]t is my understanding that I do not manage the day-to-day operations of JBAC; however, I have spent a growing amount of time being

involved in JBAC since the start" and "[s]o my intention was never to run the day-to-day operations of JBAC. That was not my responsibility." (ECF No. 57.1, at p. 82.) Burnette also testified that he "was to be taking care of acquisitions and financing for the acquisitions and the strategic direction." (*Id*.) However, Burnette also claims that he was "pretty active in JBAC the entire time." (*Id*.)

10. It also is undisputed that after this lawsuit was filed, Burnette retained counsel to defend him and JBAC in the action. Burnette wired $50,000 in funds from JBAC's bank account to pay the law firm he retained. (ECF No. 57.1, at pp. 61–63.) It is undisputed that Burnette did not seek Clark's consent, as co-manager of JBAC, to make that payment.

11. On June 25, 2019, Clark filed a complaint against Defendants Burnette and JBAC. (Complaint, ECF No. 3.) In the Complaint, Clark alleges the following: a claim against Burnette for breach of the Operating Agreement (First Claim); in the alternative, a claim against Burnette for quantum meruit (Third Claim); a claim for judicial dissolution pursuant to N.C.G.S. § 57D-6-02 (Fourth Claim); and claims against both Burnette and JBAC for declaratory judgment pursuant to N.C.G.S. §§ 1-253 and 1-254 (Second Claim) (*Id*. at ¶¶ 36–68.) The claim for declaratory judgment seeks the following declarations:

> a. That Defendant has failed to fulfill his obligations under paragraph 5.03(h) of the operating agreement entered into on or about November 16, 2012 between Plaintiff and Defendant, that said failure constitutes a breach of the operating agreement, and as a result of Defendant's breach he should be precluded from enforcing other terms of the operating agreement, namely paragraph 16.03(b)(3).

b. That paragraph 16.03(b)(3) of the operating agreement . . . is voided because it is inconsistent with Defendant's stated intention to attorney Lance Fife on or about November 18, 2011 regarding the parties "sharing in risk and gain."

c. That paragraph 16.03(b)(3) of the operating agreement . . . is voided because it is both substantively and procedurally unconscionable.

d. That paragraph 16.03(b)(3) of the operating agreement . . . is voided because it refers to the "acquisition price (initial value)" on "Exhibit A;" however, the actual Exhibit A attached to the operating agreement references only "Initial Capital Contributions" and "Ownership Units." Put another way, the Exhibit A referred to in paragraph 16.03(b)(3) does not appear to exist.

e. That the operating agreement . . . does not contain a merger clause and is therefore not the entire agreement between the parties.

f. That Defendant had certain obligations under the operating agreement . . . *to wit*, "Acquiring, Financing, and Strategic Direction of Investments," and Defendant has failed to fulfill his obligations under the operating agreement.

g. That Plaintiff had certain obligations under the operating agreement . . . *to wit*: "Collections, Property Maintenance and day to day operations," and Plaintiff has satisfactorily fulfilled his obligations under the operating agreement.

(ECF No. 3, at ¶¶ 48(a)–(g).)

12. On August 20, 2019, Defendants filed their Motion to Dismiss (ECF No. 13) and a Memorandum in Support of Motion to Dismiss. (ECF No. 14.) Following

briefing and a hearing, the Court denied Defendants' Motion to Dismiss on January 28, 2020. (ECF No. 25.)

13. On March 11, 2020 Defendants filed an Amended Answer and Counterclaim. ("Counterclaim," ECF No. 29.) Defendants' counterclaim was a cause of action for declaratory judgment regarding Burnette's right to reimbursement of attorneys' fees he paid on behalf of JBAC and Burnette's right to advancement of his attorneys' fees paid in defending against this lawsuit. (*Id.* at pp. 11–12.)

14. On June 10, 2020, Defendants filed a motion for summary judgment seeking judgment in their favor on the counterclaim for reimbursement and advancement. ("Defs.' Mot. for SJ on Defs.' CCs," ECF No. 38.) Following briefing and a hearing, the Court issued its Order and Opinion granting Defs.' Mot. for SJ on Defs.' CCs. (ECF No. 65.)

15. On October 28, 2020, Clark filed his Motion for Summary Judgment, a Memorandum of Law in support (Clark's Br. in Supp. of Mot. SJ, ECF No. 58), and an Index of Exhibits in Support of his Motion and exhibits. (ECF No. 57 and 57.1–57.8.) Clark seeks summary judgment on all of his claims. Defendants filed a Response in Opposition to Clark's Motion for Summary Judgment ("Defs.' Response in Opp.," ECF No. 62), and Clark filed a reply brief (ECF No. 66).

16. On October 29, 2020, Defendants filed their Motion for Summary Judgment as well as an Index of Exhibits in support of the motion and exhibits. (ECF Nos. 60 and 60.1–60.6.) Defendants also filed a brief in support of their Motion for Summary Judgment. ("Defs.' Brief in Support," ECF No. 61.) Defendants move for

summary judgment on Clark's claims for breach of contract against Burnette (First Claim); for quantum meruit against Burnette (Third Claim); and for declaratory judgment against both Burnette and JBAC (Second Claim). Defendants do not seek summary judgment on Clark's claim for dissolution of JBAC (Fourth Claim). Clark filed his Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Clark's Br. in Opp.," ECF No. 64), and Defendants filed a Reply. (ECF No. 69.)

17. On December 11, 2020, Defendants filed a Motion to Strike pursuant to Rules 37 and 26(e) ("Motion to Strike," ECF No. 67) and a Memorandum in Support of their Motion to Strike. (ECF No. 68.) On December 23, 2020, Clark filed a Brief in Opposition to Defendants' Motion to Strike (ECF No. 72) and on January 4, 2021, Defendants filed their Reply in Support of Motion to Strike. (ECF No. 73.)

18. The Court held a hearing on the Motions on January 27, 2021 where counsel presented their arguments. The Motions are now ripe for decision.

## II. STANDARD OF REVIEW

19. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting N.C.G.S. § 1A-1, N.C. R. Civ. P. 56(c)). The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a

matter of law.  *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008).

Where the moving party is the defendant, they may meet this burden by "proving an

essential element of the opposing party's claim does not exist, cannot be proven at

trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*,

365 N.C. at 523.  An issue is "material" if "resolution of the issue is so essential that

the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C.

230, 235 (1972).  "A 'genuine issue' is one that can be maintained by substantial

evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

20.    "Once the party seeking summary judgment makes the required

showing, the burden shifts to the nonmoving party to produce a forecast of evidence

demonstrating specific facts, as opposed to allegations, showing that he can at least

establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85

(2000).  As recently reiterated by the North Carolina Court of Appeals, the burden on

the non-movant goes beyond merely producing some evidence or a scintilla of evidence

in support of its claims.  Rather,

> [i]f the movant meets this burden, the nonmovant must
> take affirmative steps to set forth specific facts showing the
> existence of a genuine issue of material fact. An adverse
> party may not rest upon the mere allegations or denials of
> his pleading. A genuine issue of material fact is one that
> can be maintained by substantial evidence. Substantial
> evidence is such relevant evidence as a reasonable mind
> might accept as adequate to support a conclusion and
> means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, 2017 N.C. App. LEXIS 715, at *15 (N.C. Ct. App. Sept. 5,

2017) (unpublished) (citations and internal quotation marks and modifiers omitted).

III.  ANALYSIS

21.  The Court will first address Defendants' Motion to Strike, followed by the Motions for Summary Judgment.

**A.  Motion to Strike**

22.  In the Motion to Strike, Defendants move to strike the affidavit of Carrole Mulkey Dayton, dated September 15, 2020.  ("Dayton Affidavit," ECF No. 57.6.)  Defendants seek to strike the Dayton Affidavit pursuant to Rules 37(d) and 26(e) of the North Carolina Rules of Civil Procedure ("Rule(s)"), on the grounds that Clark violated Rule 26(e) by failing to produce the Dayton Affidavit, a document responsive to Burnette's First Set of Requests for Production, until after the close of discovery.  (ECF No. 67, at p. 1.)  In the alternative, Defendants request the Court exercise its inherent authority to strike the affidavit.  (*Id.*)  Clark opposes the Motion to Strike.  (ECF No. 72.)

23.  "A motion to strike is addressed to the sound discretion of the trial court."  *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at *8 (N.C. Super. Ct. Feb. 17, 2016) (citing *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25 (2003)).

24.  The Court has thoroughly considered the arguments of the parties and finds that Defendants have failed to establish that they have been substantially prejudiced by the filing of the Dayton Affidavit, particularly in light of the fact that the Court has not relied on its contents in deciding the Motions for Summary

Judgment. Therefore, the Court CONCLUDES, in its discretion, that the Motion to Strike should be DENIED.

**B.     Motions for Summary Judgment**

25.     Since both Clark and the Defendants separately seek summary judgment in their favor on Clark's claims for declaratory judgment, breach of contract, and quantum meruit, the Court will first address these three claims. The Court will then turn to Clark's Motion for Summary Judgment on its claim for judicial dissolution.

*i.     Declaratory Judgment*

26.     Clark and the Defendants seek summary judgment in their favor on Clark's claim for declaratory judgment against Burnette and JBAC. (ECF No. 3, at p. 6.) Resolution of the declaratory judgment claim will significantly inform the Court's determination of the remaining claims. Thus, the Court begins with this claim.

27.     Under North Carolina law, a declaratory judgment is a statutory remedy that grants the courts authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. N.C.G.S. § 1-253; *Town of Pine Knoll Shores v. Carolina Water Serv.*, 128 N.C. App. 321, 321 (1998). The Court may, by declaratory judgment, "determine[ ] any question of construction or validity" and declare "rights, status or other legal relations" under a written contract. N.C.G.S. § 1-254. "As with all other actions, . . . there must be a justiciable controversy before the Declaratory Judgment Act may be invoked. There

is a justiciable controversy if litigation over the matter upon which declaratory relief is sought appears unavoidable." *Ferrell v. Department of Transp.*, 334 N.C. 650, 656 (1993). An action for declaratory judgment is ripe for adjudication when "there is an actual or real existing controversy between parties having adverse interests in the matter in dispute." *Andrews v. Alamance Cty.*, 132 N.C. App. 811, 813–14 (1999).

28. It is undisputed that the Operating Agreement is a valid contract. The Court now turns to each of the declarations that Clark requests.

### a. Paragraphs 48(a) and 48(f) of the Complaint

29. In paragraphs 48(a) and 48(f) of the Complaint, Clark effectively seeks the same declarations: that Burnette breached Article 5.03(h) of the Operating Agreement, the provision making Burnette "[p]rimarily responsible for Acquiring, Financing, and Strategic Direction of Investments" for JBAC. (ECF No. 3, at ¶¶ 48(a) and (f).) Clark argues that Burnette failed to fulfill his obligations under Article 5.03(h) because he did not acquire any new properties for JBAC after October 2013. (ECF No. 58, at pp. 11–17.) Clark also seeks a declaration that "as a result of [Burnette]'s breach he should be precluded from enforcing other terms of the operating agreement, namely [Article] 16.03(b)(3)." (*Id.* at ¶ 48(a).)

30. It is undisputed that Burnette did not acquire any properties for JBAC after October 2013. (ECF No. 58, at p. 5; ECF No. 66, at pp. 6–7.) However, Clark concedes that Burnette acquired seven properties for JBAC after the parties executed the Operating Agreement and prior to October 2013. (*Id.*) Clark makes no express argument as to why Burnette's failure to acquire properties after October 2013 is a

breach of Article 5.03(h), but implies that the language of Article 5.03(h) creates an ongoing obligation to regularly acquire additional properties which Burnette failed to fulfill after October 2013. Defendants argue that the language in Article 5.03(h) regarding Burnette's duties is unambiguous and places no specific obligations on Burnette as to how many properties he must acquire for JBAC or how often. (ECF No. 62, at pp. 3–4.) Defendants contend that Burnette fulfilled his obligation under Article 5.03(h) because it is undisputed that he purchased properties for JBAC after the Operating Agreement was executed. (ECF No. 62, at p. 3.)

31. "With all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued. The intent of the parties may be derived from the language in the contract." *Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 456 (2013) (citation omitted); *see also Lane v. Scarborough*, 284 N.C. 407, 409-10, (1973) ("Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution.") The intention of the parties "is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Lane*, 284 N.C. at 410 (quoting *Electric Co. v. Ins. Co.*, 229 N.C. 518, 520 (1948)). In analyzing the intent of the parties "[t]he court must construe the contract 'as a whole' and [its provisions] must be appraised in relation to all other provisions." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273 (2008) (citation omitted).

32. "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Id.* "Whether or not the language of a contract is ambiguous . . . is a question for the court to determine." *Lynn v. Lynn*, 202 N.C. App. 423, 432 (2015) (citation omitted). An ambiguity exists when the effect of provisions is uncertain or capable of several reasonable interpretations. *Id.* If a contract is ambiguous, interpretation of the contract is a question of fact for the jury. *Variety Wholesalers, Inc.*, 365 N.C. at 525.

33. The Court has thoroughly considered the language regarding Burnette's duties under Article 5.03(h) and concludes that it is ambiguous and, accordingly, cannot be applied by the Court to determine that Burnette breached that provision of the Operating Agreement. The provision assigns Burnette the "duties" of "acquiring, financing, and strategic direction of investments," but does not define those terms nor provide specific requirements for fulfilling those duties. To the contrary, the language is, at best, vague. In addition, the other terms of the Operating Agreement do not provide context to or illuminate the specific nature of the duties undertaken by Burnette in Article 5.03(h). Therefore, the interpretation of the language in Article 5.03(h) is an issue for the jury.

34. Defendants further argue that Clark's claim for breach of Article 5.03(h) is barred by the three-year statute of limitations. (ECF No. 61, at p. 6.) Specifically, Burnette argues that his last acquisition on behalf of JBAC occurred in October 2013, and that to the extent Burnette's failure to acquire properties forms the basis for a

breach of contract claim, such a breach is barred by the three-year statute of limitations pursuant to N.C.G.S. § 1-52(1) since this lawsuit was not filed until June 15, 2019. (ECF No. 61, at pp. 7-8.)

35. Clark correctly contends that a cause of action for breach of contract does not accrue until the claimant learns, or reasonably should have learned, that a breach has occurred. (ECF No. 64, at p. 9.) *Chisum v. Campagna*, 2021 NCSC 7, ¶75 (2021) ("[A] claim for breach of contract accrues when the plaintiff knew or should have known that the contract had been breached.").[2] Clark testified in his deposition that in "the latter part of 2016, it was becoming clear that a breach existed (ECF No. 60.1, at p. 50), and that he "became aware that [Burnette] had no further intention of acquiring property for JBAC on or about September 26, 2018" (*Id.* at p. 62). If believed, both of these dates would be within three years prior to the filing of this lawsuit and fall within the applicable statute of limitations. Consequently, the Court finds that a dispute of fact exists regarding when Clark's claim for breach of contract accrued and summary judgment is inappropriate.

36. Therefore, the Court concludes that to the extent Clark seeks declarations that Burnette "failed to fulfill his obligations" under Article 5.03(h) and that "as a result of [Burnette]'s breach he should be precluded from enforcing other terms of the operating agreement, namely [Article] 16.03(b)(3)," Clark's Motion for

---

[2] In *Chisum*, the Supreme Court also held that a claim for a declaratory judgment seeking a declaration that a breach of contract occurred accrues at the time the claimant knew or should have known a breach occurred. *Chisum*, 2021 NCSC 7, at *37.

Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment seeking judgment in Defendants' favor on this claim should be DENIED.

### b. Paragraph 48(b) of the Complaint

37. Clark seeks a declaration that "paragraph 16.03(b)(3) of the operating agreement entered into on or about November 16, 2012 between Plaintiff and Defendant is voided because it is inconsistent with Defendant's stated intention to Fife on or about November 18, 2011 regarding the parties 'sharing in risk and gain.'" (ECF No. 3, at ¶48(b)). Defendants argue that Burnette's November 18, 2011 communication to Fife occurred almost a year before the parties executed the Operating Agreement, and that even if Burnette's communication to Fife constituted an agreement, the Operating Agreement superseded it. (ECF No. 61, at p. 15.)

38. Clark fails to present any argument in his briefs regarding the declaration he seeks in paragraph 48(b). Therefore, the Court concludes that to the extent Clark seeks a declaration that "paragraph 16.03(b)(3) of the Operating Agreement . . . is voided because it is inconsistent with Defendant's stated intention to attorney Lance Fife on or about November 18, 2011 regarding the parties 'sharing in risk and gain," Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

### c. Paragraph 48(c) of the Complaint

39. Clark seeks a declaration that "paragraph 16.03(b)(3) of the [O]perating [A]greement entered into on or about November 16, 2012 between Plaintiff and

Defendant is voided because it is both substantively and procedurally unconscionable." (ECF No. 3, at ¶48(c).)

40. In their Memorandum in Support of their summary judgment motion, Defendants argue that Clark had sufficient opportunity to review the terms of the Operating Agreement, and that Clark has failed to present any evidence showing both procedural and substantive unconscionability, both elements that Clark must prove when asserting a contract is unconscionable. (ECF No. 61, at p. 18.) In Clark's Brief in Opposition, Clark fails to present any argument regarding the declaration he seeks in paragraph 48(c). Therefore, the Court concludes that to the extent Clark seeks a declaration that "paragraph 16.03(b)(3) of the operating agreement . . . is voided because it is both substantively and procedurally unconscionable," Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

### d. Paragraph 48(d) of the Complaint

41. Clark seeks a declaration that

> paragraph 16.03(b)(3) of the operating agreement entered into on or about November 16, 2012 between Plaintiff and Defendant is voided because it refers to the "acquisition price (initial value)" on "Exhibit A;" however, the actual Exhibit A attached to the operating agreement references only "Initial Capital Contributions" and "Ownership Units." Put another way, the Exhibit A referred to in paragraph 16.03(b)(3) does not appear to exist.

(ECF No. 3, at ¶48(d).)

42. In support of summary judgment, Clark argues: (a) Article 16.03(b)(3) should be voided because he did not receive and did not have the opportunity to

review the JBAC Properties List either prior to or at the moment the Operating Agreement was signed, which Clark contends, establishes a lack of "meeting of the minds" as to what constitutes the JBAC Properties List, (ECF No. 58, at p. 12); (b) that the addition of the JBAC Properties List after execution of the Operating Agreement required an "amend[ment] by affirmative vote as required by Section 17.14 of the Operating Agreement" (*id.* at pp. 12–13); and (c) that the document listing the properties is not titled as "Exhibit A" and contains some information regarding the "Acquisition Cost" of the properties that differs from the sales price for the properties provided in Wake County's public records. (id. at p. 12.)

43.     Defendants argue that the parties had a meeting of the minds with regards to the JBAC Properties List because Clark was on notice of the properties JBAC owned as they were listed in the company's books and records, and because Burnette transmitted the JBAC Properties List to Clark on the same day the Operating Agreement was executed in an email he sent to Fife. (ECF No. 61, at pp. 20–21.) Defendants also argue that the differences between the "acquisition costs" in the JBAC Properties List and the sales prices that appears in Wake County's records are due to Wake County listing a "package sale price," which is different from the acquisition cost for each property listed in the alleged Exhibit A. (ECF No. 62, at p. 12.)

44.     "No contract is formed without an agreement to which at least two parties manifest an intent to be bound." *Parker v. Glosson*, 182 N.C. App. 229, 232 (2007) (citing *Croom v. Goldsboro Lumber Co., Inc.*, 182 N.C. 217, 220 (1921) (stating

that mutual assent is an "essential element" of every contract. This mutual assent is customarily described as a "meeting of the minds." *See Charles Holmes Mach. Co. v. Chalkley*, 143 N.C. 181, 183 (1906) ("The first and most essential element of an agreement is the consent of the parties, an *aggregatio mentium*, or meeting of two minds in one and the same intention, and until the moment arrives when the minds of the parties are thus drawn together, the contract is not complete, so as to be legally enforceable.")). "A contract, and by implication a provision, 'leaving material portions open for future agreement is nugatory and void for indefiniteness.'" *MCB, Ltd. v. McGowan*, 86 N.C. App. 607, 609 (1987) (citing *Boyce v. McMahan*, 285 N.C. 730, 734 (1976)). "Consequently any contract provision . . . failing to specify either directly or by implication a material term is invalid as a matter of law." *Id.* at 609.

45. The Court first considers the language of Article 16.03(b)(3) in its proper context and in conjunction with the other terms of the Operating Agreement. *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629 (2003) ("The various terms of the [contract] are to be harmoniously construed . . . ."). Each clause and word is considered with reference to each other and is given effect by reasonable construction. *Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 93 (1965) ("[A] paragraph or excerpt must be interpreted in context with the rest of the agreement." (quoting 1 Strong's North Carolina Index: *Contracts* § 12, at 585 (1957))).

46. Article 16 of the Operating Agreement is titled "Dissolution and Termination." (ECF No. 40.2, at p. 14.) Article 16.03(b)(3) is found within Article

16.03, "Winding Up, Liquidation and Distribution of Assets." (*Id.*) Articles 16.03(a) and (b) provide that "[u]pon dissolution, the Company shall conduct an accounting of its accounts, assets, liabilities and operations" and "[t]he Managers shall distribute all of the Company's assets . . . in the following order," first to "the payment of the expenses of liquidation and the debts and liabilities of the Company" and then to setting up any reserves necessary to additional anticipated obligations of JBAC. (*Id.*)

47. Article 16.03(b)(3) specifically addresses the valuation of JBAC real property assets and provides that in the event Clark dissolves JBAC, Burnette can elect to keep "all existing real estate" and that "Clark shall receive one-half (1/2) of the value of the properties listed on Exhibit 'A' at the acquisition price (initial value) shown on Exhibit "A" ( . . . ) and NOT of the current fair market value 'FMV' of the properties at the time of . . . Dissolution[.]" (*Id.* at p. 15 (capitalization in original).) On the other hand, the parties agreed that if Burnette elected to dissolve JBAC, Clark and Burnette would "split any equity in the Company equally." (*Id.*, at Art. 16.04.) It is clear from the context that the Company's "equity" includes the fair market value of JBAC's real property at the time of dissolution.

48. Considered in context with the other provisions of Article 16, the language used in Article 16.03(b)(3) does not support Clark's contention that he and Burnette did not have a meeting of the minds. Rather, the language reflects that the parties agreed upon a means of determining how Clark's value in JBAC's real property would be valued if he dissolved JBAC, and that he would be credited with one-half the cost of acquiring the property. Article 16.03(b)(3) does not leave

"material portions open for future agreement," nor does it "fail[ ] to specify either directly or by implication a material term." *MCB, Ltd.*, 86 N.C. App. at 609.

49. Clark contends that, because he had not seen the JBAC Properties List when he signed the Operating Agreement, there could not have been a meeting of the minds as to the contents of the list. The Court disagrees. Article 16.03(b)(3) clearly expresses the parties' intent to set out the acquisition costs of certain JBAC properties in a list to be attached to the Operating Agreement. It is undisputed that Exhibit A to the Operating Agreement executed by Clark was not the Exhibit A referenced in Article 16.03(b)(3). Nevertheless, the intent to include such a list is clear.

50. Furthermore, since Article 16.03(b)(3) reflects Clark and Burnette's agreement to attach to the Operating Agreement a list of JBAC properties to be used for valuing Clark's interest, neither the failure to attach it at the moment of execution nor the erroneous reference to "Exhibit A" negates the agreement. "Every valid contract must contain a description of the subject-matter; but it is not necessary it should be so described as to admit of no doubt what it is, for the identity of the actual thing and the thing described may be shown by extrinsic evidence." *Rawls & Assocs. v. Hurst*, 144 N.C. App. 286, 290 (2001). Here, the list of JBAC properties that the parties intended to attach to the Operating Agreement can be established by extrinsic evidence.

51. The Court finds no merit in Clark's argument that there was no meeting of the minds due to the failure to attach the JBAC Properties List at the time Clark

signed the Operating Agreement. Article 16.03(b)(3) clearly outlines the aftermath of dissolution, and how Clark's interest in JBAC's real property would be valued if he elected to dissolve. The parties had a meeting of the minds that the properties and their acquisition costs or values would be provided in a separate list to be attached to the Operating Agreement. Section 16.03(b)(3) does not leave any material provision open such that the Court can declare this section "nugatory and void for indefiniteness." *MCB, Ltd.*, 86 N.C. App. at 609 (citing *Boyce v. McMahan*, 285 N.C. 730, 734 (1976)).

52. The fact that the document labeled "Exhibit A" attached to the Operating Agreement was not the JBAC Properties List also does not create an issue of fact as to a meeting of the minds. Clark, as a signatory to the Operating Agreement, is charged with knowledge of the provisions of the Operating Agreement. *Jones v. Home Sec. Life Ins. Co.*, 254 N.C. 407, 413 (1961) ("In the absence of fraud or mistake, a party will not be heard to say that he was ignorant of the contents of a contract signed by him." (quoting *Cuthbertson v. Insurance Co.*, 96 N.C. 480, 486 (1887)); *see also Bell v. Nationwide Ins. Co.,* 146 N.C. App. 725, 728 (2001) (quoting same). Clark was, or should have been, aware that Exhibit A was not the list of properties referenced in Article 16.03(b)(3), and that he was signing the Operating Agreement without the JBAC Properties List being attached. Clark does not allege he was defrauded, and he cannot now be heard to claim that he was unaware that the JBAC Properties List was not attached at the time he signed the Operating Agreement.

53. The fact that the sales prices for some of the properties in Wake County's records differ slightly from the acquisition costs listed in what Defendant now claims to be the JBAC Properties List also does not create an issue of fact as to whether there was a meeting of the minds. What actually constituted the JBAC Properties List, as well as the contents of that list and the accuracy of the acquisition prices, can be shown by extrinsic evidence.

54. Finally, since the Court concludes that the parties had a meeting of the minds and agreed that the JBAC Properties List would be attached to the Operating Agreement, the Court is not persuaded by Clark's argument that the later attachment of the list required an amendment to the Operating Agreement.

55. Therefore, to the extent Clark seeks a declaration that paragraph 16.03(b)(3) of the Operating Agreement is voided because the "Exhibit A referred to in paragraph 16.03(b)(3) does not appear to exist," Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

### e. Paragraph 48(e) of the Complaint

56. Clark seeks a declaration that "the operating agreement entered into on or about November 16, 2012 between Plaintiff and Defendant does not contain a merger clause and is therefore not the entire agreement between the parties." (ECF No. 3, at ¶ 48(e).) Defendants seek summary judgment regarding this declaration, arguing that Clark has failed to create an issue of fact that there are additional agreements between Clark and Burnette outside of the Operating Agreement. (ECF

No. 61, at p. 22.)  Defendants argue that "[w]hen asked . . . what other terms besides the [Operating Agreement] form the parties' entire agreement," Clark responded only that "Burnette has on multiple occasions . . . represented to Clark that each is to be a 50/50 partner sharing equally in risk and gain."  (ECF No. 61, at p. 22 (citing Clark's 3rd Supp. Resp. Interrog., ECF No. 57.7, at p. 10).)  Defendants contend that the Operating Agreement creates the 50/50 partnership, and Clark's so-called "extrinsic agreement . . . does not alter and is consistent with the" Operating Agreement.  (*Id*.)

57.    Clark did not respond to Defendants' argument and did not address the declaration sought in paragraph 48(e) of the Complaint anywhere in his briefing.

58.    While the Operating Agreement does not contain a merger clause, Clark has failed to produce evidence creating a genuine issue of fact that the Operating Agreement is not the entire agreement between the parties.  Therefore, to the extent Clark seeks a declaration that the Operating Agreement does not contain a merger clause, Clark's Motion for Summary Judgment should be GRANTED, and Defendants' Motion for Summary Judgment should be DENIED.  However, to the extent Clark seeks a declaration that the Operating Agreement is not the entire agreement between the parties, Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

    f.    **Paragraph 48(g) of the Complaint**

59.    Clark seeks a declaration that

> [Clark] had certain obligations under the operating agreement entered onto on or about November 16, 2012 between Plaintiff and Defendant *to wit*: Collections, Property Maintenance and day to day operations, and

> Plaintiff has satisfactorily fulfilled his obligations under the operating agreement.

60. It is undisputed that Burnette was not significantly involved in JBAC's day-to-day operations until approximately 2019. Clark contends that since JBAC has been in operation since late 2011,

> the fact that [Clark] satisfactorily performed the day-to-day management of JBAC [is] the only logical inference that can be drawn . . . [o]therwise, JBAC would have simply ceased to exist. A real estate management company could not have existed for roughly eight years without someone handling day-to-day operations, collections, and property maintenance.

(ECF No. 58, at p. 18.)

61. Defendants argue that, at times, Clark's management of the day-to-day operations did not yield sufficient cash flow, and that once Burnette started becoming more involved with JBAC's operations, its performance improved dramatically. (ECF No. 61, at p. 23.) Burnette testified that there were periods of time during which Clark did not keep JBAC's properties rented, failed to timely collect rent from tenants, and did not keep up with repairs to the properties. (ECF No. 57.1, at pp. 124–26.) Clark himself testified: "[t]here were many, many times where we were unable to pay our bills." (ECF No. 60.1, at p. 46.)

62. The evidence raises an issue of fact as to whether Clark "satisfactorily fulfilled his obligations under the operating agreement" to perform the duties of "collections, property maintenance and day to day operations." Therefore, to the extent Clark seeks a declaration that he satisfactorily performed his obligations for "collections, property maintenance and day to day operations" of JBAC, Clark's

Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be DENIED.

*ii. Breach of Contract*

63. Clark also claims Burnette breached the Operating Agreement "by *inter alia* failing to take any affirmative steps to acquire, or successfully strategically direct JBAC's investments." (ECF No. 3, at ¶¶ 36–43.) In his briefing, Clark also contends that Burnette breached the Operating Agreement by "1) not managing the day-to-day operations of JBAC; and 2) spending over $5,000.00 from JBAC's accounts without the written consent of Clark" and "being totally unfamiliar with JBAC's operating procedures in order to facilitate day-to-day operating activities." (ECF No. 58, at p. 8.)

64. The Court already has addressed Clark's claim that Burnette breached Article 5.03(h) by failing to acquire additional properties for JBAC after October 2013. For the same reasons stated therein, to the extent the parties seek summary judgment in their respective favors on Clark's claim that Burnette breached the Operating Agreement by failing to acquire additional properties for JBAC after October 2013, Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be DENIED.

65. With regard to Clark's additional claims for breach of the Operating Agreement, Defendants first argue that they are entitled to summary judgment because Clark did not allege them in the Complaint, and cannot raise the claims for the first time in a motion for summary judgment. (ECF No. 61, at p. 8; ECF No. 62,

at p. 4.) However, Defendants admit that Clark raised the alleged additional breaches in his responses to Defendants' discovery requests. (ECF No. 61, at p. 8.) This is borne out by the record evidence which establishes that Clark explicitly raised the claims in supplemental responses to Defendants' interrogatories. (ECF No. 57.7, at pp. 6–8.) The additional claimed breaches are properly before the Court.

66.     Clark's claim that Burnette breached the Operating Agreement by failing to participate in the day-to-day management of JBAC borders on being frivolous. As Defendants correctly contend, the provision at issue – "[t]he Managers shall have the responsibility for the day-to-day operation and management of the Company" (ECF No. 40.2, at p. 5, Article 5.02(b)) – is standard language in a limited liability operating agreement delegating general authority to the managers. (ECF No. 62, at pp. 5–6.) However, the parties expressly agreed in the Operating Agreement that Clark had primary responsibility for day-to-day management of JBAC. (ECF No. 40.2, at p. 6.) Well established rules of contract construction hold that the specific assignment of duties governs over the general assignment. *Lail v. Cleveland County Bd. of Educ.*, 183 N.C. App. 554, 563 (2007) ("Our cannons of contract construction hold that 'when general terms and specific statements are included in the same contract and there is a conflict, the general terms should give way to the specifics.'" (quoting *Wood--Hopkins Contracting Co. v. North Carolina State Ports Auth.*, 284 N.C. 732, 738 (1974))). The Court concludes that the unambiguous terms of the Operating Agreement assign day-to-day management

responsibilities to Clark and not to Burnette, and therefore Clark's claim fails as a matter of law.

67. Therefore, to the extent the parties seek summary judgment in their respective favors on Clark's claim that Burnette breached the Operating Agreement by failing to participate in the day-to-day management of JBAC, Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

68. Clark also alleges that Burnette breached Article 5.02(c) by directing the payment of $50,000 from JBAC's accounts to the law firm Burnette retained to represent both him and JBAC in this lawsuit without obtaining Clark's consent as co-manager of JBAC. (ECF No. 58, at pp. 9–10.) Clark contends that by admitting that he directed the payment, Burnette has "admitted" breaching the Operating Agreement. (*Id.* at p. 9.) In response, Defendants argue that he did not breach the agreement because "[t]he Operating Agreement entitles both Burnette and JBAC to advancement of defense expenses." (ECF No. 62, at p. 7.)

69. The Court concludes that it effectively decided this claim when it issued its Order and Opinion on Defendants' Motion for Summary Judgment on Defendants' Counterclaim. *Clark v. Burnette*, 2020 NCBC LEXIS 139, *11-12 (N.C. Super. Ct. Dec. 2, 2020) ("Order and Opinion"). In the Order and Opinion, the Court held that Burnette was entitled to advancement of the legal expenses incurred in defending the claims made against him in this lawsuit and for legal expenses he paid out-of-pocket for the defense of the claims made against JBAC. *Id.* at *24. Such entitlement arises

both under the terms of the Operating Agreement and under the North Carolina Limited Liability Act. *Id*. at \*22. Accordingly, while the better course of conduct may have been for Burnette to consult with Clark and seek his consent before directing the $50,000 payment from JBAC to his lawyers, the Court holds that his failure to do so was not a breach of the Operating Agreement.[3]

70.     Therefore, to the extent the parties seek summary judgment in their respective favors on Clark's claim that Burnette breached the Operating Agreement by failing to obtain Clark's consent to make the $50,000 payment for advancement and reimbursement of legal expenses, Clark's Motion for Summary Judgment should be DENIED, and Defendants' Motion for Summary Judgment should be GRANTED.

*iii. Quantum Meruit*

71.     In the alternative to the claim for breach of contract, Clark alleges a claim for quantum meruit against Burnette. Clark argues that he "furnished . . . labor, time, and expertise for the use and benefit of Defendant [*sic*]," that Burnette accepted this labor without objection, and that Clark did not supply his labor gratuitously. (ECF No. 3, at ¶¶ 51, 53, 54.) Clark alleges that Burnette "has failed or refused to modify the oppressive terms of the . . . [O]perating [A]greement in a way that would fairly protect and compensate Clark for the value of [his] labor, time, and expertise." (*Id*. at ¶ 55.) Plaintiff and Defendants move for summary judgment on Clark's claim for quantum meruit. (ECF Nos. 56 and 59.)

---

[3] The Court understands that the parties have now agreed upon a process for providing advancement and reimbursement. By its holding that Burnette did not violate the Operating Agreement in directing this initial payment to the law firm, the Court is not authorizing Burnette to direct future payments for advancement or reimbursement other than under the process agreed upon by the parties.

72.     Defendants argue that the existence of the Operating Agreement, an express contract between the parties, defeats Clark's claim for unjust enrichment. (ECF No. 61, at p. 12.)  Where an express contract exists covering the same subject matter, a claim for quantum meruit must fail.  *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713 (1962) ("[A]n express contract precludes an implied contract with reference to the same matter.").  Clark concedes that "in the event some or all of the Operating Agreement is held to be enforceable by the Court that his *quantum meruit* claim is no longer necessary."  (ECF No. 64, at p. 12.)

73.     It is undisputed that the Operating Agreement is an enforceable, express contract.  The Operating Agreement explicitly provides for how the members of JBAC are to be compensated by salary (ECF No. 40.2, at p. 6), and by distributions (*Id.* at p. 10).  Given that an express contract exists regarding the issue of compensation, Clark's claim for unjust enrichment seeking compensation for services he performed for JBAC must fail.  Therefore, to the extent it seeks summary judgment on Clark's claim for unjust enrichment seeking compensation for services he performed for JBAC, Defendants' Motion for Summary Judgment should be GRANTED, and Plaintiff's Motion for Summary Judgment should be DENIED.

*iv. Judicial Dissolution*

74.     Clark moves for summary judgment on his claim for judicial dissolution pursuant to N.C.G.S. § 57D-6-02.  (ECF No. 56.)

75.     The superior court may dissolve an LLC in a proceeding brought by either of the following:

(1) . . .

(2) A member, if it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and this Chapter or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member.

N.C.G.S. § 57D-6-02

76.     The Court concludes that the question as to whether Burnette breached the Operating Agreement remains for determination by a jury.  Since a jury trial is necessary, the Court will defer ruling upon the request for judicial dissolution until the trial of this matter.  Therefore, to the extent Clark seeks summary judgment in his favor on the claim for judicial dissolution, Clark's Motion for Summary Judgment should be DENIED at this time.

IV.     CONCLUSION

THEREFORE, IT IS ORDERED that:

a. Defendants' Motion to Strike is DENIED.

b. To the extent Clark seeks declarations that Burnette "failed to fulfill his obligations" under Article 5.03(h) and that "as a result of [Burnette]'s breach he should be precluded from enforcing other terms of the operating agreement, namely [Article] 16.03(b)(3)," Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment seeking judgment in Defendants' favor on this claim is DENIED.

c. To the extent Clark seeks a declaration that "paragraph 16.03(b)(3) of the Operating Agreement entered into on or about November 16, 2012 between

Plaintiff and Defendant is voided because it is inconsistent with Defendant's stated intention to attorney Lance Fife on or about November 18, 2011 regarding the parties 'sharing in risk and gain," Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment seeking judgment in Defendants' favor is GRANTED.

d. To the extent it seeks a declaration that "paragraph 16.03(b)(3) of the operating agreement entered into on or about November 16, 2012 between Plaintiff and Defendant is voided because it is both substantively and procedurally unconscionable," Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment seeking judgment in Defendants' favor is GRANTED.

e. To the extent Clark seeks a declaration that paragraph 16.03(b)(3) of the Operating Agreement is voided because "the Exhibit A referred to in paragraph 16.03(b)(3) does not appear to exist," Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment seeking judgment in Defendants' favor is GRANTED.

f. To the extent Clark seeks a declaration that the Operating Agreement does not contain a merger clause, Clark's Motion for Summary Judgment is GRANTED, and Defendants' Motion for Summary Judgment is DENIED. However, to the extent Clark seeks a declaration that the Operating Agreement is not the entire agreement between the parties, Clark's Motion for Summary Judgment

is DENIED, and Defendants' Motion for Summary Judgment seeking judgment in Defendants' favor is GRANTED.

g. To the extent Clark seeks a declaration that he satisfactorily performed his obligations for "Collections, Property Maintenance and day to day operations" of JBAC, Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is DENIED.

h. To the extent the parties seek summary judgment in their respective favors on Clark's claim that Burnette breached the Operating Agreement by failing to participate in the day-to-day management of JBAC, Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

i. To the extent the parties seek summary judgment in their respective favors on Clark's claim that Burnette breached the Operating Agreement by failing to obtain Clark's consent to make the $50,000 payment for advancement and reimbursement of legal expenses, Clark's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

j. To the extent the parties seek summary judgment in their respective favors on Clark's claim for unjust enrichment seeking compensation for services he performed for JBAC, Defendants' Motion for Summary Judgment is GRANTED, and Clark's Motion for Summary Judgment is DENIED.

k. To the extent Clark seeks summary judgment in his favor on the claim for judicial dissolution, Clark's Motion for Summary Judgment is DENIED at this time.

SO ORDERED, this the 29th day of April, 2021.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases